IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIE L. YOUNG           :     CIVIL ACTION
                           :
       v.                :
                           :
J.T. MEDDEN, et al.       :     NO. 03-5432

MEMORANDUM

McLaughlin, J.                                 April 20, 2010

The Court held a bench trial in this prisoner civil rights case on the plaintiff's remaining claims: (1) Eighth Amendment claims based on allegations that certain prison officials physically assaulted the plaintiff and placed substances in the plaintiff's food; (2) claims under the First Amendment and under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") based on allegations that certain prison officials interfered with the plaintiff's ability to practice his religion; and (3) Fourteenth Amendment claims that certain prison officials mistreated the plaintiff on the basis of his religion.

The Court finds for the defendants and against the plaintiff on all of these claims.

I.   Procedural History

After the Court granted the plaintiff's request for leave to proceed in forma pauperis, the plaintiff filed his initial complaint against Lt. Medden, Officer Wright,

Superintendent Vaughn and an unnamed corrections officer on June 25, 2004. In that complaint, the plaintiff alleged that, on January 8, 2003, while he was an inmate at SCI-Graterford, Officer Wright and an officer later identified as "Officer Chickoviact" assaulted him. He alleged that Lt. Medden, later identified as Lt. Madden, supervised and was later assigned to investigate the incident. Based on these allegations, the plaintiff asserted that his Eighth and Fourteenth Amendment rights were violated.

The plaintiff filed his complaint pro se. He moved for the appointment of counsel, and the Court granted the motion on July 8, 2004. The Court, however, was unable to find counsel willing to represent the plaintiff at that time.

On October 12, 2004, the plaintiff moved for a temporary restraining order. On October 20, 2004, the defendants filed a motion to dismiss. The defendants' motion was granted as to Superintendent Vaughn and denied as to the other defendants on January 7, 2005. Also on January 7, 2005, the Court denied the plaintiff's request for a temporary restraining order.

On February 18, 2005, the plaintiff filed another complaint in case number 05-773. The plaintiff amended that complaint and, on March 31, 2005, the Court consolidated case number 05-773 with this case. Several defendants were added to

the docket.[1]  The Court also ordered that the two complaints
would be consolidated and together would function as the
operative pleading in this case.  The plaintiff filed another
request for a temporary restraining order on April 8, 2005.

The defendants responded to the consolidated complaint
with a partial motion to dismiss on August 12, 2005.  The
defendants filed a response in opposition to the plaintiff's
request for a temporary restraining order on August 15, 2005.
The defendants also filed an amended partial motion to dismiss on
that date.  The plaintiff responded to both filings by the
defendants on August 31, 2005.

On February 23, 2006, the Court denied the plaintiff's
request for a temporary restraining order and granted in part and
denied in part the defendants' partial motion to dismiss.[2]  The

---

[1]     The docket lists the following defendants:  J.T.
Medden, J.A. Wright, Officer Chickcoviact, the Department of
Corrections, SCI-Graterford, Superintendent Donald Vaughn,
Superintendent D. DiGulielmo, Deputy Laranzo, Deputy Arolyo,
Major Blizzered, Lt. Robenson, Lt. Johnson, Lt. Radle, Lt.
Medden, Ms. Hatcher, Officer Silver, Officer Quick, Officer
Andrews, Officer Clark, Officer Medaz, Officer Campbell, SCI-
Huntingdon, Superintendent J. Grace, R.H.U. Staff, Lt. Wilts,
Capt. Attamashafer, Lt. Walters, Sgt. House, Sgt. Shoemaker,
Officer Hand, and Officer Parks.  The defendants "J.T. Medden"
and "Lt. Medden" were later determined to be a single defendant,
Lt. Madden.  "Officer Silver" was later determined to be Officer
Sivera.

[2]     The Court granted the motion to dismiss the following
defendants:  SCI-Graterford, SCI-Huntingdon, the Department of
Corrections, Superintendent DiGulielmo, Superintendent Grace,
Deputy Laranzo, Deputy Arolyo, Major Blizzered, Lt. Robenson, Lt.
Johnson, Ms. Hatcher, Officer Quick and Capt. Attamanshafer.

case was then placed in suspense while the Court made a second attempt to obtain counsel for the plaintiff. That attempt was also unsuccessful.

The plaintiff appealed several of the decisions rendered against him to the United States Court of Appeals for the Third Circuit on September 15, 2006. The Court of Appeals dismissed the plaintiff's appeal for lack of jurisdiction and pursuant to 28 U.S.C. § 1915(e)(2)(B) on July 6, 2007.

The Court then vacated its Order placing the case in suspense, and, after holding a telephone conference with the plaintiff and the defendants' counsel, the Court set a discovery deadline of February 28, 2008. After the discovery period had ended, the defendants filed a motion for partial summary judgment on March 28, 2008.

The plaintiff then filed several motions to compel discovery. He also filed another motion for a preliminary injunction and a temporary restraining order and a motion to have the Court withdraw as presiding judge over this matter. The Court denied all of these motions, but allowed the plaintiff's motions to compel discovery to be filed as affidavits to his response to the defendants' motion for partial summary judgment. Additionally, the Court held an on-the-record status conference on March 3, 2009, to allow the plaintiff the opportunity to

present his response orally to the defendants' motion for partial summary judgment.

The Court granted the defendants' partial motion for summary judgment in part and denied it in part in an Order dated April 30, 2009.[3] The Court then scheduled a bench trial[4] to hear the remaining issues against the remaining defendants, as follows: claims of assault against Lt. Madden, Officer Wright, "Officer Chickoviact"/Officer Jancoviak, Officer Andrews, Officer Sivera and Lt. Radle; claims of food tampering against Lt. House, Officer Hand and Officer Parks; and claims of interference with the practice of religion and discrimination on the basis of religion against Lt. Wilt, Lt. House, Officer Hand and Officer Parks.

The bench trial was held in two parts. The first part of the trial occurred on July 15 and 16, 2009, and concerned the four surviving assault claims. The second part of the trial was

---

[3]     Summary judgment was granted on the claims alleged against the defendants Officer Clark, Officer Medaz, Officer Campbell, Lt. Walters and Sgt. Shoemaker.

[4]     The plaintiff made no jury demand before the March 3, 2009, telephone conference. During the conference, the defendants' counsel raised the issue of a jury trial. When asked, the plaintiff stated that he thought that he would like a jury trial, but he did not definitively request one. The defendants' counsel, however, objected to a jury trial and argued that the defendants would be prejudiced if the Court allowed the plaintiff to request a jury trial so far into the litigation. See Transcript of March 3, 2009, Telephone Conference at 59-62. The Court ordered that it would hold a bench trial in this case in an Order dated April 30, 2009.

held on October 13, 2009, and concerned the claims involving food tampering, interference with religious practices and discrimination on the basis of religion.

II. Findings of Fact

The Court will present its findings of fact in three categories: (1) the assault claims, (2) the claims of food tampering, and (3) the claims of interference with religion and discrimination on the basis of religion.

A. Assaults in Violation of the Eighth Amendment

The Court will set out the facts of the four alleged assaults in chronological order.

1. January 8, 2003

The first alleged assault occurred on January 8, 2003, and involved the plaintiff and Officer Wright. The plaintiff claims that Officer Wright and "Officer Chickoviact" pulled his hair, removing a lock of hair from his head, and pinched his side.

The plaintiff was taken to the dispensary in SCI-Graterford on January 8, 2003, for medical reasons. Mr. Young believed that he was scheduled to receive treatment for a breathing problem. Officer Wright, accompanied by an

unidentified corrections officer, escorted the plaintiff from his cell to the prison's medical wing.  When Mr. Young was in the medical unit, he was told that the staff had no order from a physician calling for breathing treatment.  The nurse informed the plaintiff that he would not be receiving the breathing treatment.  The plaintiff became agitated and refused to leave, even after he was ordered to do so by Officer Wright.

Lt. Madden was then called to the unit.  At the time, Lt. Madden was the officer in charge of F, G, H and I housing blocks, as well as the infirmary and dispensary.  When he arrived, the plaintiff was either sitting on a chair or on the floor and refused to be escorted out of the dispensary.  Lt. Madden ordered Officer Wright and the other officers present to remove Mr. Young from the unit.

The plaintiff alleges that "Officer Chickoviact" was one of the officers present.  No officer by that name worked at SCI-Graterford at the time.  The defendants submitted the testimony of Officer David Jancoviak at trial.  The defendants' counsel explained that Office Jancoviak was the corrections officer with the name closest to "Chickoviact" working at SCI-Graterford during the relevant time.

Officer Jancoviak, however, credibly testified that he was not one of the officers present on January 8, 2003.  The plaintiff also stated that Officer Jancoviak was not the officer

7

who allegedly assaulted him that day.  The Court, therefore, finds that Officer Jancoviak was not one of the officers present. The parties were unable to identify another officer who may have been the "Officer Chickoviact" named in the complaint.

Upon Lt. Madden's order, Officer Wright and three other officers lifted the plaintiff by his legs and arms.  The plaintiff began twisting and turning to get out of the officers' grip.  The plaintiff alleges that one of the officers pinched him on his right side, causing him pain, and that Officer Wright and another officer pulled his hair, removing a lock from his scalp. The Court finds that, while Mr. Young was being carried out of the medical unit, an officer did pull the plaintiff's hair as the plaintiff kicked and struggled to escape the grasp of his handlers.  The Court similarly finds that the plaintiff was pinched while the officers attempted to hold on to him.

The plaintiff also began spitting at the officers.  His spit struck Officer Wright.  Officer Wright then began to recoil, and Lt. Madden ordered Officer Wright to step away so another officer could take his position.

Concerned that the officers would have to carry the plaintiff through an area with other inmates present, Lt. Madden ordered the officers to take the plaintiff to the infirmary and place him on the ground until the plaintiff calmed down.  The officers complied with the order and placed the plaintiff face

down on the floor.  An infirmary nurse brought in a spit mask, which was placed on the plaintiff's head.

When the spit mask was secured, the officers then brought the plaintiff back to the dispensary to check for injuries.  The nurse checked the plaintiff and noted a laceration on his wrist.

The plaintiff, accompanied by the officers and Lt. Madden, began to walk to his cell.  Along the way, the plaintiff complained of breathing problems caused by the spit mask.  Lt. Madden asked the plaintiff to promise not to spit anymore.  The plaintiff gave his word that he would not spit anymore, and Lt. Madden removed the mask.

After being ordered to step away, Officer Wright reported to the operations center for further instruction.  The operations center was in the vicinity of the plaintiff and the accompanying officers' path to the plaintiff's cell.  The plaintiff then made threatening comments about Officer Wright to Lt. Madden, stating that he would "split his wig so you can see the white meat."  The plaintiff made other threatening comments at that time, saying that "[t]he first chance I get, whether it is somebody innocent or not, they're gonna eat my shit" and that "[y]ou better transfer me out of Graterford or this will never end."  See Defs' Ex. D-3.

2.    November 20, 2003

The second alleged assault occurred on November 20, 2003, and involved the plaintiff and Officer Aaron Sivera. The plaintiff claims that Officer Sivera slammed the plaintiff's face into a wall while he and Officer Robert Cox escorted the plaintiff to a judicial hearing.

The plaintiff was to be taken to the Montgomery County Court for a hearing on November 20, 2009. Due to a fight with another inmate, the plaintiff suffered from a dislocated shoulder. Because of this injury, he requested that Officers Sivera and Cox handcuff him in front. The officers hesitated to do so without approval, because prison policy requires inmates being transported from the RHU to be handcuffed in the back.

The officers called Lt. Madden, who talked to the plaintiff and ordered that the plaintiff be handcuffed behind the back. The officers then handcuffed the plaintiff behind his back. This upset the plaintiff because he believed that a medical order related to his shoulder injury excepted him from the general policy.

Officers Sivera and Cox escorted the plaintiff from his cell and out of the restricted housing unit ("RHU"). The plaintiff remained agitated, complaining about his handcuffs and cursing at the officers. While escorting the plaintiff up a

flight of stairs leading to the main prison, Officer Sivera told the plaintiff to watch his step.

The plaintiff alleges that, at this point, Officer Sivera slammed his face into the wall and started to pull him up the stairs. Officers Sivera and Cox claim that the plaintiff either tripped or slipped on the stairs, most likely as a result of his being distracted and agitated while walking. The Court accepts the testimony of Officers Sivera and Cox. That testimony is supported by the records of the injuries sustained by the plaintiff. <u>See</u> Defs' Ex. D-2, D-12-14, D-17-19.

Photographs of the plaintiff's face were taken shortly after the incident. The photographs show what appears to be a small abrasion on the plaintiff's cheek. This is corroborated by the two medical reports prepared on November 20, 2003. <u>See</u> Defs' Ex. D-2; Defs' Ex. D-17. The Court finds that this abrasion is the result of the plaintiff scraping his face upon the wall adjoining the stairs when he fell.

After the fall, the plaintiff was delivered to another officer, who dismissed Officers Sivera and Cox and escorted Mr. Young to the medical unit for treatment.


3. <u>January 17, 2004</u>

The third alleged assault took place on January 17, 2004, following a mandatory DNA extraction at SCI-Graterford.

11

The plaintiff alleges that Officer (now Lieutenant) Charles
Andrews pulled the back of his hair during the extraction and
placed him in a choke-hold.  Mr. Young also claims that Officer
Sivera hit him on the back of his head with a towel.  The
plaintiff also alleges that Officer Andrews attacked him on the
way back to his cell.  The plaintiff alleges that Officer Andrews
threw him to the floor, picked him up, and threw him into the
wall and then into a trash can.

On July 17, 2004, the superintendent of the prison
ordered that all of the inmates from the RHU be escorted to the
Assessment Unit for DNA extraction.  The officers were permitted
to use whatever force necessary to accomplish this goal.

Lt. Madden and several officers, including Officer
Sivera and Officer Andrews, went to the plaintiff's cell to take
him to the Assessment Unit.  When the plaintiff asked where they
were taking him, Lt. Madden told the plaintiff that they were
taking him "up top," which is a general reference used to
describe the medical unit, the dispensary, the general population
housing units, intake, and other areas outside the RHU.  The
officers cuffed the plaintiff and placed him in leg irons and
escorted him without incident to the Assessment Unit.

The plaintiff's DNA was taken in the dispensary without
incident.  At the dispensary, the plaintiff was forced to sit in
a chair and held down with minimal force while a syringe was

inserted into his arm.  The DNA was also extracted without incident.  The plaintiff was then fingerprinted and escorted back to his cell.  Lt. Madden was present during the DNA extraction, along with Officer Andrews.  Mr. Young was cooperative after the extraction was completed, and Lt. Madden escorted Mr. Young back to his cell without incident.  Lt. Madden was with Mr. Young the entire time during the escort back to his cell.

The defendants' testimony is consistent with a video shot in the assessment unit that captures Mr. Young's DNA extraction.  Defs' Ex. D-21.  In the video, the room contains several officers observing a medical staff person extracting blood.  Mr. Young is seated in a chair, and it appears that Officer Andrews is standing behind him.  Although Mr. Young is obscured for a portion of the video, at no point does there appear to be anything that would indicate any physical assault on Mr. Young, including hair pulling or choke holds.

The Court accepts the testimony of Officer Sivera that he did not hit Mr. Young with a towel and of Officer Andrews that he did not hit the plaintiff, put him in a choke hold or attack him while escorting him back to the cell.

Mr. Young's testimony about Officer Andrews may have been colored by Mr. Young's mistaken belief that Officer Andrews was a friend of Mr. Young's mother and had insulted his mother.

Officer Andrews testified credibly on cross examination that he
had never known anyone related to Mr. Young.

Officer Andrews testified that he previously issued a
misconduct report about Mr. Young in August of 2003 because Mr.
Young had spit at him.  Mr. Young asked if Officer Andrews knew
the reason that Mr. Young had spit at him; Officer Andrews stated
that he assumed that it was because Mr. Young was an individual
who became irate without provocation.  Mr. Young's questioning
revealed that Mr. Young believed Officer Andrews to have been a
friend of Mr. Young's mother and to have somehow insulted his
mother.  Officer Andrews stated that he had never known anyone
related to Mr. Young.

Officer Andrews testified on cross examination that he
was never involved in tampering with Mr. Young's mail.  Mr. Young
asked if Officer Andrews had once shouted in the prison halls
that Mr. Young was a man-killer; Officer Andrews stated that he
never had shouted such a thing.  Mr. Young asked if Officer
Andrews had ever threatened to go to the District Attorney with
information about Mr. Young's previous conviction; Officer
Andrews stated that he had not.  The Court found Officer Andrews
credible on these points.

4.   <u>March 30, 2004</u>

The final alleged assault occurred on March 30, 2004, during a routine search of Mr. Young's cell.  Mr. Young alleges that he was assaulted after he spit at Lt. Radle in response to Lt. Radle's previous comments about Mr. Young's family and then punched Radle in self-defense.

Mr. Young testified that he and Lt. Radle, whom Mr. Young accuses of instigating the alleged altercation of March 30, 2004, had a history of conflicts.  Mr. Young testified that Lt. Radle harassed him regarding his family.  First, Mr. Young testified that Lt. Radle had confronted him, prior to March 30, 2004, regarding Mr. Young's cousin.  Mr. Young stated that Lt. Radle believed that Mr. Young's cousin had stabbed Lt. Radle's brother at a different correctional facility.  Second, Mr. Young stated that Lt. Radle had previously announced the name and address of Mr. Young's daughter over the prison intercom system. Mr. Young testified that Lt. Radle had threatened Mr. Young's daughter and told the inmate population that he wanted her killed.

Mr. Young testified that on March 30, 2004, two officers came to his cell to perform a cell search.  He stated that he was waiting in the hallway with his hands cuffed in front of his body.  He stated that Lt. Radle was also in the hallway. Mr. Young stated that Lt. Radle began to speak to him and that he

spit at Lt. Radle's face.  Mr. Young testified that Lt. Radle
then attacked him.  Mr. Young stated that he hit Lt. Radle with
his cuffed hands, knocking Lt. Radle unconscious.

Lt. Radle testified that on March 30, 2004, he was
working as the supervisor for Mr. Young's housing unit during a
routine cell inspection.  Lt. Radle stated that he approached Mr.
Young in the hallway while two officers were inside Mr. Young's
cell.  He greeted Mr. Young, and Mr. Young then turned and spit
in Lt. Radle's face.  Lt. Radle stated that Mr. Young then
punched him in the chest with his cuffed hands and raised his
hands over his head.  Lt. Radle testified that he then struck Mr.
Young several times.  The officers in the cell came out, forced
Mr. Young to the ground, placed a spit hood over his face and
placed him in leg-irons.  Lt. Radle testified that he then went
to the medical unit for treatment of a cut on his hand.

Lt. Radle testified that he had no knowledge of Mr.
Young's address outside of the prison, or any knowledge relating
to Mr. Young's family.  He stated that he never announced
anything concerning Mr. Young's family over the prison intercom
system.

The defendants submitted photographs of Lt. Radle taken
after the altercation.  The first photograph shows Lt. Radle's
face; it is unmarked.  See Defs' Ex. D-10.  The second photograph
is of Lt. Radle's hand and shows a small cut on the knuckle of

his right little finger.  See Defs' Ex. D-11.  Photographs of Mr.
Young following the incident were also introduced by the
defendants.  Mr. Young shows no visible injuries in any of the
three photographs.  See Defs' Exs. D-7, D-8, D-9.  A medical
injury report dated March 30, 2004, and prepared after this
incident states that Mr. Young had a three inch superficial
abrasion on his right arm.  See Defs' Ex. D-5.

The defense's final witness was Officer Derrick White,
who was a corrections officer at Graterford on March 30, 2004.
White testified that he and another officer conducted the search
of Mr. Young's cell on that day.  During their search, Officer
White heard what sounded like spitting coming from outside the
cell.  He stated that he came out of Mr. Young's cell and saw Mr.
Young standing up and moving his arms up and down as if he were
punching.  Officer White stated that when they reached the cell
door, Lt. Radle and another officer had already restrained Mr.
Young in a corner.

The Court concludes that this is another situation in
which the plaintiff mistakenly believes that a corrections
officer, Lt. Radle, harassed him and his family.  The Court is
confident that that did not happen.  The Court accepts the
testimony of Lt. Radle and Officer White.  They are both entirely
credible.

B.    Food Tampering in Violation of the Eighth Amendment

Mr. Young alleges that Lt. House, Officer Hand and Officer Parks either put an unidentified substance in his food or told him that corrections officers were putting unidentified substances in his food to make him urinate. He alleges that, on October 8, 2004, Officer Hand commented that something had been placed in his food to make him urinate constantly. He also alleges that Lt. House stated, on March 11, 2005, that prison employees would stop placing substances in his food. He further alleges that Officer Parks put something in his food on an unspecified date.

Lt. House, Officer Hand and Officer Parks testified that they had never personally put substances in the plaintiff's food. Lt. House and Officer Hand testified that they had never told Mr. Young that substances were placed on his food. Lt. House testified that he did not recall ever telling Mr. Young that the officers would no longer put things in his food.

Mr. Young suffered from a bladder problem at the time that led to frequent urination. He continues to suffer from that problem. The Court finds the defendants' testimony credible and finds that the defendants' neither placed substances in the plaintiff's food nor told the plaintiff that substances were placed in his food. The Court finds that Mr. Young's frequent urination at the time was likely due to his bladder problem.

C.   The Plaintiffs' Interference with Religion and
     Discrimination Claims

The plaintiff practices what he terms African
Traditional Religion, which is known by other terms such as
Voodoo, Yoruba, Santeria and the Akan Religious System.  The
plaintiff alleges that Lt. Wilt, Lt. House, Officer Hand and
Officer Parks interfered with the practice of his religion and
discriminated against him on the basis of his religion.

Specifically, the plaintiff alleges that the defendants
insulted his religion and that Lt. House and Lt. Wilt said that
the plaintiff's religion was not wanted in the prison because
they were against the practice of Voodoo.  He further alleges
that Lt. Wilt, Lt. House, Officer Hand and Officer Parks refused
to give him access to his religious property.  Finally, he
alleges that the prison interfered with the practice of his
religion by not allowing him to keep the materials necessary for
an "ancestral altar" in his cell and by refusing to permit him
access to the materials necessary for spiritual baths.

The Court will set out the facts regarding the
plaintiff's claims of interference with his religious practices
as follows: (1) the facts establishing the background of the
plaintiff's witness, Mr. George Ware, the president of the
National African Religion Congress ("NARC"), an organization of
which the plaintiff is a member; (2) the facts of the plaintiff's

correspondence with the NARC; and (3) the facts of Mr. Young's religious practices.  The Court will then set out the facts regarding the plaintiff's discrimination claims.

1.  The Plaintiff's Witness

The plaintiff offered at trial the testimony of George Ware to establish the facts of his correspondence with the NARC and to testify as to the requirements of Mr. Young's religious practices.[5]  The Court found Mr. Ware to provide credible, informed and illuminating testimony as to both the beliefs and practices of the African religions and the details of Mr. Young's correspondence with the organization.

Mr. Ware is the president of the NARC, an organization that represents and acts as a certifying body for African-based religions in the United States and around the world.  Its goal is to bring together all of the different forms of religious expression from the African diaspora, which is comprised of individuals of African descent living in the North and South America, Central America and the Carribean.  It has a membership of approximately 10,000.  The plaintiff is a member of the NARC.

Mr. Ware testified that the NARC advocates for the reasonable accommodation of the practices of African religions,

_____

[5]     The Court arranged for the appearance of Mr. Ware at the trial.

both for the general population and for people like Mr. Young, who are confined in prisons.  At the same time, the NARC counsels practitioners in Mr. Young's position to recognize the realities inside prisons that limit such practices.  The NARC, therefore, attempts to advocate for and achieve a balance between the practice of the African religions and the realities of that practice in the prison context and elsewhere.

      2.   The Plaintiffs' Communications with NARC

Mr. Young began a correspondence with the NARC in 2003. The correspondence arose out of an attempt by the NARC to create a program providing support services to prisoners who practiced African-based religions.  The NARC keeps a file on all its members that includes, among other things, its correspondence with that member.  Mr. Ware presented Mr. Young's file as evidence at the trial.

The file mainly consists of letters sent by Mr. Young to the NARC.  The file contains just six letters sent from the NARC to Mr. Young, dated as follows:  July 14, 2003; September 4, 2003; October 16, 2003; December 5, 2003; January 6, 2005; and August 3, 2005.  There is also a certified delivery notice from the United States Postal Service for the letter dated January 6, 2005.

The letter dated August 3, 2005, signed by Mr. Boui Foley, the NARC's certification officer, stated that Mr. Foley did not understand why Mr. Young was not receiving correspondence from the NARC.  From this, Mr. Young inferred that prison officials were interfering with his mail and preventing him from receiving letters from the NARC.  Lt. House and Officer Hand, however, testified that they never interfered with the plaintiff's incoming or outgoing mail.

Mr. Ware stated that contents of the file were most likely complete and that it is very likely that the NARC did not respond to every letter sent to them by Mr. Young.  Mr. Ware explained that, due to the size of its membership, the NARC has trouble responding to all correspondence from its individual members.

The Court finds that the six letters in the file constitute all of the correspondence sent by the NARC to Mr. Young.  Mr. Young confirmed that he had received all six of these letters.  The Court also finds Lt. House's and Officer Hand's testimony that they never interfered with the plaintiff's religious mail to be credible.

3.   The Plaintiff's Religious Practices

Mr. Young practices a mixture of the Yourba, Santeria and Voodoo religions.  All are monotheistic religions that hold

as a central tenet that people cannot be grounded in today's world unless they are connected with their past.  As part of the religion, therefore, practitioners revere and remember their ancestors.

A central part of their religious practice includes an ancestral altar.  In the Santeria religion, for instance, such altars are called a "white table," on which practitioners keep photographs of their relatives.  They also keep a glass or cup of water on this table, as a sign of reverence for their ancestors.  The contents of ancestral altars can vary, as variations in income and social instability have historically dictated improvisation.  Because practitioners of the African religions often had to adopt their practices to their surroundings, practices such as ancestral altars have developed a capability for adaptation.

Mr. Young seeks to keep a cup of water, a cup of coffee or tea, a piece of fruit, and a small capful of "fruit water," composed of fruit skins or peels, salt and water, on his ancestral altar.  Mr. Young alleges that the prison has inhibited his religious practice by restricting the use of these items for this purpose.

According to prison policy at the time, inmates were restricted from keeping cups in their cells, because inmates sometimes used those cups to throw liquid substances, including

urine, at corrections officers.  Mr. Young, himself, engaged in this practice at SCI-Graterford, where he used a milk carton to throw urine at corrections officers.  Trial Trans., Vol. 3 at 85:10-22.  Under the policy, cups were required to be turned in after a meal, and, if a cup was found in an inmate's cell, it was seized as contraband.  That policy has since changed, but no evidence was presented at trial as to the reason or reasons behind the policy change.[6]

Inmates are also restricted from keeping fruit in their cells, out of a concern that the fruit could draw insects or pose other health risks and that the inmates could ferment the fruit to create alcoholic beverages.  Inmates are allowed, however, to keep a piece of fruit in their cell overnight.

Mr. Ware testified that the only essential requirements of an ancestral altar are a cup of water and some sort of recognition of a practitioner's ancestors, such as a list of names or photographs.  Mr. Ware stated that, although he would have to consider the issue in the context of "the prison's reality," he would "consider it unfortunate if [the prison] said [the plaintiff] couldn't have a plastic cup of water."  Transcript of Trial, October 13, 2009, at 67:1-4.

---

[6]     Lt. Wilt speculated that the policy change may have been due to the fact the inmates began using milk cartons to collect and throw substances and a cup may be more sanitary. This, however, was just speculation on his part.

Mr. Ware, however, also testified that Mr. Young's current practices are not only sufficient, but may go beyond what is necessary to pay respects to his ancestors in accordance with his religion. Mr. Ware advised that whatever Mr. Young "feels comfortable with that [he] can resolve within the confines of the prison system" is satisfactory to pay due respect to his ancestors. Id. at 48:5-19.

Mr. Young also alleges that the defendants interfered with his ability to take spiritual baths because he was not permitted to keep or create the materials for his baths. The African religions believe that the body may be healed from illnesses through spiritual baths. If a person comes to a priest with a disease or illness, the priest uses divination to see if he can help the person. If the priest can, the priest will give the person a spiritual bath made up of various herbs. Spiritual baths also may be given as a preventive act to avoid illness. The plaintiff attempted to make the materials for a spiritual cleansing bath out of fruit peels and skins.

Mr. Ware, however, testified that, because the religions are related to the forces of nature, one of the most powerful baths can be had from simple rainwater because rainwater is one of the most powerful healing forces on the planet. He suggested that Mr. Young, therefore, could use rainwater for a cleansing spiritual bath.

Mr. Ware also testified that, outside of such elemental baths, ceremonial cleansings are traditionally done by priests and require a priest to either administer the bath or, at least, supply the practitioner with the proper materials for the bath. The contents of those materials are closely held secrets of the religions, known only by priests.  Mr. Young, therefore, would not be able to create the necessary mixtures on his own.

Finally, the plaintiff alleges that the defendants denied him access to religious property from his stored property and also forced him to ship religious books out of his stored property.  He also alleges that the policy limitations on the number of books and other property that he may keep in his cell burdens the practice of his religion.

Lt. House testified that, under prison policy, inmates are allowed to keep one legal-record sized box of material in their cells.  Inmates may keep whatever they wish in the box, with up to ten books, ten magazines and a newspaper permitted at a time.  Inmates may participate in a legal materials exchange every 30 days.  Library books may be requested on a weekly basis. Lt. Wilt testified that an inmate is only allowed to keep so much property in storage and that, if an inmate is over that limit, the inmate has the opportunity to send the excess property home.

Lt. Wilt testified that, upon being taken to the Restricted Housing Unit, Mr. Young had the opportunity to visit

the property room, inventory his property, and take any items that would fit in his box to his cell, unless such items were contraband. Lt. Wilt testified that he did not tell Mr. Young that he could not take religious material from the property room to his cell. Lt. House testified that he did not recall specifically restricting Mr. Young's access to his property or requiring Mr. Young to ship books out of his property.

The Court finds this testimony credible. If the defendants denied the plaintiff access to his property or required him to ship some property home, they did so only in accordance with prison policy and did not specifically deny the plaintiff access to his religious property.

### 4. Claims of Discrimination on the Basis of Religion

The plaintiff alleges that Lt. House, Lt. Wilt, Officer House and Office Parks discriminated against him on the basis of his religion when they made inappropriate comments about his religion in his presence. The plaintiff alleges that Officer Hand made such inappropriate comments regarding the plaintiff's religion on May 11, 2004, when he said that he would not allow Voodoo to be practiced in the prison. He also alleges that Lt. House made similar inappropriate comments on September 24 and October 3, 2004. He alleges that Lt. Wilt insulted his religion

on September 24 and October 18, 2004.  He also alleges that Officer Parks generally mistreated him on religious grounds.

Lt. House, Lt. Wilt, Officer Hand and Officer Parks all testified that they were not aware of what religion Mr. Young practiced and that they never stated that Mr. Young could not practice Voodoo in the institution.  The Court finds the testimony of these officers credible and finds that none of the defendants was aware of the plaintiff's religion or stated they would not allow the practice of Voodoo in the prison.

IV.  <u>Analysis</u>

The Court will analyze the plaintiff's claims in the following order:  (1) the claims of assault under the Eighth Amendment, (2) the claims of food tampering under the Eighth Amendment, (3) the claims of interference with the practice of religion under the First Amendment and the RLUIPA, and (4) the claims of discrimination on the basis of religion under the Fourteenth Amendment.

A.  <u>Eighth Amendment Claims of Assault</u>

The test for whether a claim of excessive force is constitutionally actionable is whether "force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing

harm." <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986). Factors for consideration in an excessive force case include: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. <u>Giles v. Kearney</u>, 571 F.3d 318, 326 (3d Cir. 2009).

     1.   <u>January 8, 2003</u>

The plaintiff alleges that on January 8, 2003, defendants Officers Wright and another man identified by the plaintiff as "Officer Chickoviak," later alleged to be Officer Jancoviak, pinched him and pulled his hair while forcibly removing him from the medical unit of Graterford.

Based upon Officer Jancoviak's testimony and the plaintiff's statements at trial that Officer Jancoviak was not the officer present on January 8, 2003, the Court finds that Officer Jancoviak was not present at the time.

The Court also finds that, while Mr. Young was being carried out of the medical unit, Officer Wright more likely than not did pull the plaintiff's hair as the plaintiff kicked and struggled to escape the grasp of his handlers. The Court will

assume that the plaintiff's testimony regarding the loss of a lock of his hair is truthful and correct.

Even with this assumption, however, the Court does not find that the defendants were acting without a legitimate penological purpose. Mr. Young was admittedly refusing to leave the medical unit after discovering that he was not scheduled to receive breathing treatment. Mr. Young was admittedly kicking out his legs as the guards attempted to carry him out of the unit. The Court finds no evidence to suggest that any pain caused by the defendants in attempting to remove Mr. Young from the medical unit was a malicious attempt to inflict pain on the plaintiff. The Court will, therefore, enter judgment in favor the defendants on this count.

### 2.   November 20, 2003

The second alleged assault involved Officer Sivera, whom the plaintiff accuses of having slammed his face into a wall while escorting the plaintiff to court. The Court finds Officer Sivera's testimony regarding this allegation to be credible and corroborated by both the testimony of Robert Cox and the photographs and medical reports demonstrating that Mr. Young suffered only a minor abrasion on his face on this particular day. The plaintiff was admittedly irate on this day and was

verbally abusing Officer Sivera prior to walking up the stairs where the incident occurred.

The Court finds that it is more likely than not that Mr. Young slipped while walking up the stairs, scraped his face on a wall and then began accusing Sivera of assaulting him. The claim is not credible considering the circumstances leading up to the alleged assault and the gap between the injuries one would expect from a face-slam and those actually documented following the incident. Judgment will be entered in favor of Officer Sivera on this claim.

### 3.  January 17, 2004

The plaintiff claims that, on January 17, 2004, Officer Andrews pulled his hair and placed him in a choke hold during a DNA extraction. He claims that Officer Sivera smacked him in the back of the head with a towel. Finally, the plaintiff claims that Officer Andrews then assaulted him while escorting the plaintiff back to his cell.

The Court has viewed a video of the DNA extraction and sees no activity that would substantiate the plaintiff's claims regarding Officer Andrews' behavior during the medical procedure. The testimony of Officer Andrews, Officer Sivera and Lt. Madden are all in conformity with the depiction of the DNA extraction contained on the video provided by the defense. The Court also

finds that Officer Andrews and Lt. Madden's testimony that Mr. Young was escorted back to his cell without incident following the procedure is credible. The Court finds, therefore, that Officer Sivera did not hit the plaintiff with a towel.

The Court also finds that Officer Andrews did not attack the plaintiff while escorting him back to his cell. Although Officer Andrews appeared to be in good physical health, it is unlikely that a man of Officer Andrews' size and stature would be able to throw a man of the plaintiff's size and stature to the ground, against a wall, into a trash can and back down on the floor. Assuming that Officer Andrews was physically capable of those actions, the Court finds it similarly unlikely that the only repercussions of such treatment would be to leave the plaintiff uninjured.

Finally, the plaintiff's questioning of Officer Andrews revealed that the plaintiff harbors a belief that Officer Andrews was in some way involved in a slight against the plaintiff's family. The plaintiff apparently believes that, sometime prior to 1985, Officer Andrews was a friend of the plaintiff's mother who insulted her in some way. The Court finds that Officer Andrews did not know anyone in the plaintiff's family in 1985 and that the plaintiff has mistaken Officer Andrews for another person. Considering that mistaken belief in conjunction with the plaintiff's allegations against Officer Andrews, the Court finds

that the plaintiff's testimony was likely motivated by a misdirected desire for revenge against a perceived insult.

The Court will enter judgment in favor the defendants on this count.

### 4. <u>March 30, 2004</u>

The plaintiff alleges that on March 30, 2004, he was assaulted by Lt. Radle during a cell search. The plaintiff admittedly spit at Lt. Radle prior to the alleged assault. He then claims that Lt. Radle began punching him. The plaintiff claims that, although he was handcuffed, he was able to punch Lt. Radle defensively and knock him unconscious.

The Court finds that Lt. Radle's actions on March 30, 2004, were conducted for the legitimate penological purpose of subduing an inmate who attempted to assault him in the belief that Lt. Radle had threatened the inmate's family. Lt. Radle testified that he approached Mr. Young and was spit at and then punched by Mr. Young. He stated that he then struck Mr. Young, subdued him in a corner of the hallway, and placed a spit-hood over his face with the assistance of other officers. This testimony is corroborated by the testimony of Officer White. Although Officer White testified that he did not see the beginning of the assault, he did state that he saw Lt. Radle

subdue the plaintiff.  This contradicts the plaintiff's testimony
that Lt. Radle was knocked unconscious by the plaintiff.

Medical records also undermine the plaintiff's version
of these events.  Photographs of Lt. Radle's face show no
bruising, redness or any other marks that would be consistent
with a frontal attack rendering him unconscious.  It appears that
Mr. Young's testimony was influenced by his false view that Lt.
Radle had threatened his family.  The Court finds that Mr. Young
was belligerent toward Lt. Radle and that Lt. Radle took the
necessary actions to restore order to his unit.  The Court will
enter judgment in favor of Lt. Radle on this count.


B.    Eighth Amendment Claims of Food Tampering

The plaintiff alleges that Lt. House, Officer Hand and
Officer Parks told him that a substance was being placed into his
food to make him urinate.  In order to state a constitutional
claim of cruel and unusual punishment, a plaintiff's complaint
must satisfy both an objective and subjective requirement for an
Eighth Amendment action pursuant to 42 U.S.C. § 1983.  Wilson v.
Seiter, 501 U.S. 294, 298-99 (1991).  To satisfy the objective
element, a plaintiff must show that there was a deprivation and
that it was sufficiently serious.  Id. at 298.

The Court finds for the defendants on this claim.  The
plaintiff has not shown that he suffered a sufficiently serious

deprivation amounting to a constitutional claim of cruel and unusual punishment.  The defendants all credibly testified that they did not personally place substances in the plaintiff's food, that they had no knowledge of any substances being placed in his food, and never stated to him that a substance had been placed in his food.  The frequent urination experienced by the plaintiff can be plausibly explained by the bladder problem from which he suffered at the time.

The Court will enter judgment in favor of the defendants on these claims.

C.    Claims of Interference with Religious Practices

The plaintiff claims that Lt. Wilt, Lt. House, Officer Hand and Officer Parks all interfered with his ability to practice religion in violation of the First Amendment and the RLUIPA.

Convicted inmates do not forfeit all constitutional protections by reason of their conviction and confinement in prison.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Inmates, therefore, retain their First Amendment right to freely exercise their religion.  Id.  This does not mean, however, that these rights are not subject to restrictions and limitations. The fact of confinement, along with the legitimate goals and policies of the penal institution, limit an inmate's

constitutional rights to those rights that are not inconsistent with an inmate's status as a prisoner or with the legitimate penological objectives of the prison. Bell v. Wolfish, 441 U.S. 420, 545-46 (1979).

Under the First Amendment, therefore, a prison regulation that burdens religious beliefs is valid if it is reasonably related to legitimate penological interests. DeHart v. Horn, 390 F.3d 262, 268 (3d Cir. 2004). Courts use a four factor test for determining whether a prison regulation is reasonably related to a legitimate penological interest under the First Amendment: (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and the allocation of prison resources; and (4) whether alternatives exist that fully accommodate the inmate's rights at de minimis cost to valid penological interests. Turner v. Safley, 482 U.S. 78, 89-91 (1987).

The RLUIPA, 42 U.S.C. § 2000cc-1, provides further protections for inmates in the exercise of their religion. Under the RLUIPA, an inmate must first prove that the government imposed a substantial burden on his religious exercise. Once a substantial burden is established, the burden shifts to the

government to show that the regulation is in furtherance of a compelling governmental interest and that it is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a)(1), (a)(2).

The Court addresses the plaintiff's First Amendment and RLUIPA claims in the following order: (1) the claims of interference with the plaintiff's ability to keep the materials that he believed were required for the practices of maintaining an ancestral altar and participating in spiritual baths, (2) the claims that the prison interfered with the plaintiff's access to religious books and property, and (3) the claims of interference with the plaintiff's religious mail.

### 1. The Prison's Cup and Fruit Policies

The plaintiff claims that the prison interfered with the practice of religion by denying him a cup of water, a cup of coffee, dried fruit skins or peels, and a cap of fruit water for his ancestral altar. The Court finds that the defendants violated neither the First Amendment nor the RLUIPA by prohibiting the plaintiff from keeping these items in his cell.

### a. The First Amendment

The first element of the First Amendment analysis requires the Court to consider whether the defendants have

demonstrated that the restrictions on the plaintiff's religious practices bear a valid and rational connection to a legitimate and neutral objective. Under this element, the Court affords great deference to the judgment of prison officials, who are charged with the "formidable task" of running a prison. Sutton v. Rasheed, 323 F.3d 236, 253 (3d Cir. 2003).

The interest in maintaining order and safety in the prison has been recognized as a valid penological interest that may justify restrictions on inmates' constitutional rights. To determine whether such restrictions are reasonably related to that interest, the Court must take into account the fact that such considerations "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Hubbard v. Taylor, 399 F.3d 150, 159 (3d Cir. 2005).

The Court concludes that the policy prohibiting inmates from keeping cups in their cells passes the rational relationship test. According to the evidence presented by the defendants at trial, the regulation prohibiting inmates from keeping cups in their cell protected corrections officers from the danger of having liquid substances, including urine, thrown at them by

inmates.  It is obvious that such a practice compromises the order and safety of the prison, and the regulation prohibiting the collection of cups therefore rationally serves the legitimate penological interest of curbing this behavior.

The restriction against keeping fruit in an inmate's cell also passes the rational relationship test.  According to the evidence, the policy prohibited the accumulation of fruit in order to prevent insect infestation and other health problems and to prevent prisoners from fermenting the fruit to make alcoholic beverages.  The legitimate government interest of promoting prison health and in preventing inmates from creating alcoholic beverages in their cells provides a rational basis for the prison's policy.

Under the second element, whether there was an alternative means of expressing Mr. Young's constitutional rights at the time, the Court considers whether the inmate has other means of practicing his religion generally, not whether he has other means of engaging in any particular practice.  Sutton, 323 F.3d at 255.  Where other avenues remain available for the exercise of the inmate's religious faith, courts should remain conscious of the deference that courts give to corrections officials. Id.

The Court finds that there were many avenues open to Mr. Young to practice his religion.  As Mr. Ware testified, the

religion practiced by Mr. Young has been commonly adapted to changing circumstances and adverse conditions. With regard to his ancestral altar, Mr. Ware testified that Mr. Young should "feel satisfied" that "whatever he feels comfortable with and can be resolved within the confines of the prison system" is sufficient to pay the proper respects to his ancestors. Trial Trans., Vol. 3 at 48:13-16. Mr. Young's current practices, therefore, were "not only sufficient," but "go beyond what is necessary" to practice his religion. Id. at 49:5-7. With regard to the spiritual baths, Mr. Ware testified that Mr. Young already had access to rainwater, believed to be one of the most effective forms of spiritual bath, and that only priests could create the mixtures necessary for other forms of spiritual baths. The Court, therefore, again defers to the corrections officials' attempts to advance the penological interests of health and safety.

The third and fourth elements focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for prison personnel, other inmates and for the allocation of prison resources. Sutton, 323 F.3d at 257. The Court, again deferring to prison's judgment in protecting the legitimate penological interests of order and safety in the prison, holds that these elements are also met. As the Court has explained, the regulation prohibiting inmates from keeping cups

in their cell protected prison personnel from the danger of having liquid substances, including urine, thrown at them by inmates.  For similar reasons, allowing inmates to store fruit indefinitely in their cells presents a danger to the health of the inmates and the use of the fruit to create alcoholic beverages presents a threat to both inmate health and the safety of the prison personnel.  An accommodation allowing Mr. Young to keep a cup or fruit in his cell, therefore, would potentially have a significant adverse impact on prison personnel.

        b.   <u>RLUIPA</u>

Under the RLUIPA, the government shall not substantially burden the exercise of religion by an institutionalized person unless the burden is in furtherance of a compelling governmental interest and is the least restrictive means of achieving that interest.  42 U.S.C. § 2000cc-1.

For the purposes of the RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. <u>Washington v. Klem</u>, 497 F.3d 272, 280 (3d Cir. 2007).  Although

the RLUIPA does not permit a court to determine whether the belief or practice in question is compelled by, or central to, a system of religious belief, RLUIPA does permit inquiry into the sincerity of a prisoner's religious beliefs.  Id. at 277.

The Court does not decide whether the prison's policies create a substantial burden on the plaintiff's religious practices.  Although the Court found Mr. Ware's testimony to be credible, informed and sincere, it was not clear from that testimony whether or not water and fruit skins or peels are necessary components of the plaintiff's religious practices.  For example, although he testified that some vessel containing water was "essential" to an ancestral altar, he also stated that he would have to consider the issue in light of "the prison's reality" before answering whether a policy prohibiting inmates from keeping plastic cups in their cells would be reasonable.

Furthermore, the RLUIPA limits the Court's inquiry to the sincerity of a practitioner's beliefs, not whether such beliefs are compelled or required by a particular religious system.  Regardless of Mr. Ware's testimony, it may be that a substantial burden was created by the policies because the plaintiff believes that a cup of water and fruit are necessary components for his ancestral altar or his spiritual baths.

The Court, however, does not need to determine whether these policies created a substantial burden on the plaintiff's

religious practices.  Even assuming that they do, the Court finds
that the government has met its burden of showing that the
policies are the least restrictive means of achieving a
compelling governmental interest.

The Court of Appeals for the Third Circuit has
recognized that the interests of health and safety play a
particularly important role in the institutional setting.  Klem,
497 F.3d at 283.  Prison order and safety, therefore, are
compelling reasons to justify regulating items allowed in
inmates' cells.  Cutter v. Wilkinson, 544 U.S. 709, 722 (2005)
("We do not read RLUIPA to elevate accommodation of religious
observances over an institution's need to maintain order and
safety.").  The Supreme Court in Cutter noted the importance of
granting deference to prison administrators' expertise and
advised courts to show "particular sensitivity to security
concerns."  Id. at 722-23.  Even in light of the substantial
deference given to prison authorities, however, "the mere
assertion of security or health reasons is not, by itself, enough
for the Government to satisfy the compelling governmental
interest requirement."  Klem, 497 F.3d at 283.  Rather, the
particular policy must further this interest.

The policy prohibiting inmates from keeping cups in
their cells furthers the compelling interest of maintaining order
and safety in the prison.  The purpose of the regulation

prohibiting cups in inmates' cells was to prevent inmates from
using collected cups to throw urine and other liquid substances
at corrections officers.  The defendants credibly testified at
trial that they had personally witnessed inmates engaging in this
practice.  Mr. Young, himself, admitted that he had engaged in
such an activity at SCI-Graterford, using a milk carton to throw
urine at corrections officers.  The practice of throwing urine
and other substances presents obvious health and safety risks in
the prison and seriously compromises the ability of prison
personnel to maintain order and safety in the prison.

The policy prohibiting inmates from keeping fruit in
their cells also furthers the compelling interests of health and
safety.  Allowing inmates to store fruit indefinitely in their
cells presents a real danger to the health of inmates and the use
of the fruit to create alcoholic beverages presents a threat to
both inmate health and the safety of the prison personnel.  The
prison has a compelling interest in preventing these dangers.

The Court also finds that the prison furthers these
interests in the least restrictive means possible.  Inmates were
not entirely prohibited from having cups in the cells.  Instead,
the prison policy limited the use of cups to mealtimes, a minor
sacrifice in light of the strong interests involved.  Similarly,
inmates are allowed to keep a piece of fruit overnight and must
only turn the fruit in when it is replaced by another piece of

fruit. Inmates, therefore, are not denied fruit and must only relinquish their fruit when it is replaced the next day. This is also a minimal burden given the compelling interests involved. The Court, therefore, finds that the prohibition on cups and fruit are minimally restrictive means of protecting the prison's compelling interests.

### 2. The Prison's Inmate Property Policies

The plaintiff alleges that the defendants denied him access to religious property that was held in storage and forced him to send religious books home. The Court finds that the defendants credibly testified that they never specifically denied the plaintiff access to his religious property, and, if they did deny him access to any of his property or required him to send property home, they did so in accordance with prison policy.

The plaintiff, however, further alleges that the prison's policy allowing an inmate to possess only 10 books at a time and the prison's limitations on the amount of materials he may keep in his cell or in storage interfere with the practice of his religion. The Court finds that these policies violate neither the RLUIPA nor the First Amendment.

In Klem, the United States Court of Appeals for the Third Circuit found that a prison's restriction of the number of books possessed by an inmate could create a substantial burden on

the inmate's practice of religion pursuant to the RLUIPA. 497 F.3d at 281-83. In that case, however, the plaintiff believed that his religion required him to read four books per day, and the prison regulations only allowed him to exchange 10 books a week. Reversing a grant of summary judgment for the defendant, the Court of Appeals found that the restriction did create a substantial burden on the plaintiff's practice of his religion. Id.

In this case, the plaintiff did not establish that the prison's 10-book limit or the limitation on the amount of property he can keep in his cell or in storage creates a substantial burden on his religious practice. Unlike the inmate in Klem, Mr. Young never testified that he believes that his religion requires him to have greater access to religious texts or materials. Mr. Young, therefore, did not testify that he was forced to choose between forfeiture of benefits otherwise generally available to other inmates or abandoning one of the precepts of his religion in order to receive a benefit, or that the government put substantial pressure on him to substantially modify his behavior and to violate his beliefs. Nor did Mr. Young testify that the policy infringed on any expression of his religion protected by the First Amendment.

3.    Interference with Religious Mail

The plaintiff alleges that his religious mail was interfered with by the defendants.  The Court finds that there is no evidence showing that any particular piece of mail was prevented from reaching the plaintiff.  Mr. Young testified that he had received all six of the letters sent to him by the NARC that were contained in the NARC file.  Mr. Ware stated that this was all of the correspondence sent from the NARC to Mr. Young. Additionally, the defendants credibly testified that they never interfered with the plaintiff's religious mail.

D.    Claims of Discrimination on the Basis of His Religion

The plaintiff alleges that he was discriminated against on the basis of his religion.  These claims appear to be based solely on his allegations that Lt. Wilt, Lt. House, Officer Hand and/or Officer Parks stated that they did not want Voodoo to be practiced in their prison.

The defendants all deny knowing what religion Mr. Young practiced and deny ever stating that they disapproved of the practice of Voodoo in the prison.  The Court found their testimony credible.

An appropriate order follows separately.